UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCOTT BROWN,

       Plaintiff                        Civil Action No. 08-12992

v.                                   HON.  PATRICK J. DUGGAN
                                     U.S. District Judge
                                   HON. R.  STEVEN WHALEN

COMMISSIONER OF SOCIAL          U.S. Magistrate Judge
SECURITY,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Scott Brown brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment DENIED.

## PROCEDURAL HISTORY

On September 19, 2002,  Plaintiff filed an application for DIB, alleging an onset of disability date of August 20, 2001 (Tr. 98-100).  After the initial denial of the claim, Plaintiff filed a request for an administrative hearing, held on November 30, 2004 (Tr. 580).  On

February 16, 2005, Administrative Law Judge ("ALJ") Regina Sobrino found that Plaintiff was not disabled (Tr. 69).  On February 23, 2006, the Appeals Council remanded the case for a second administrative hearing (Tr. 380-383).  On January 25, 2007, ALJ Sobrino again found Plaintiff not disabled (Tr. 53).  On September 25, 2007, the Appeals Council remanded the case for a third administrative hearing, held on December 14, 2007 in Flint, Michigan before ALJ Joel Fina (Tr. 34, 672).  Plaintiff, represented by attorney Lewis Seward, testified (Tr. 676-700) as did Plaintiff's mother, Carol Brown (Tr. 701-704), Medical Expert ("ME") Dr. Robert Fritzen (Tr. 704-714), and Vocational Expert ("VE") Stephanie Leech (Tr. 714-720). On December 27, 2007, ALJ Fina determined that Plaintiff was not disabled (Tr. 25). On June 16, 2008, the Appeals Council denied review (Tr. 8-10).  Plaintiff filed for judicial review of the final decision on July 11, 2008.

## **BACKGROUND FACTS**

Plaintiff, born September 4, 1963, was age 44  when the ALJ issued his decision (Tr. 98).   He received a GED and worked previously as a construction laborer, production worker, and welder (Tr. 129, 158).  Plaintiff alleges disability as a result of back injuries and degenerative changes to the spine (Tr. 123).

### A.  Plaintiff's Testimony[1]

---

[1]Plaintiff's cites his earlier hearing testimony for the limited purpose of noting that back pain obliged him to lie on the floor multiple times each week for one to three hours.

Plaintiff, 5' 11" and 186 pounds, reported that he currently lived in Vassar, Michigan with his parents (Tr. 677).   Although alleging disability as of August 20, 2001, Plaintiff indicated that he last worked in 2005 for two months on a part-time basis as a janitor, adding that back pain forced him to quit (Tr. 678).  He reported that prior to his 2001 back injury he worked as a heavy equipment operator and a laborer (Tr. 679).  Plaintiff, noting that he had attempted to find work, opined that his back problems made him unemployable (Tr. 679). He testified that following his 2001 injury, he received a Workers' Compensation settlement of $75,000, but currently did not receive long or short term disability payments (Tr. 679-680).

Plaintiff indicated that he was able to care for his personal needs but was unable to drive for long distances (Tr. 681).  He admitted performing a number of household chores, but stated that back pain prevented him from standing for more than 10 minutes at a time (Tr. 681-682).  He denied vacuuming, taking out the trash, or any activities requiring stooping (Tr. 682).  Plaintiff reported that he could walk up to almost a mile before experiencing back pain and was able to grocery shop by using the shopping cart for support (Tr. 683).  He indicated that before losing his home to foreclosure in August, 2006 he was able to mow the lawn with a riding mower, adding that mowing his small lawn took no more than five minutes (Tr. 684-685).  Plaintiff testified that he continued to socialize on a regular basis but

---

*Plaintiff's Brief, Docket #,* 6 (*citing  November 30, 2004 Administrative Hearing*, Tr. 602-603).   Plaintiff's earlier testimony is otherwise not cited by either party.   As such, the summation of Plaintiff's testimony refers exclusively to statements made at the December 14, 2007.

was unable to fish or hunt (Tr. 684, 686-687). He reported that he could lift a gallon of milk with both hands and was able to climb stairs with the aid of a handrail (Tr. 687-688). He testified that a previous knee condition was resolving, but noted that he continued to experience constant "sharp, throbbing [back] pain" radiating into his left hip (Tr. 688-689).

Plaintiff reported that he took Tramadol and Cymbalta (Tr. 689). He indicated that although he had previously sought and received psychological treatment for depression, he was currently unable to afford continued treatment (Tr. 690). He stated that he had seen a medical doctor recently for a cortisone injection (Tr. 690). Plaintiff reported that a "typical day" consisted of arising at 7:00 or 8:00 a.m., having coffee, doing some stretching exercises, meeting his grown daughter or a friend for lunch, and visiting with neighbors (Tr. 692-693). Noting that he got along well with his former bosses and coworkers, Plaintiff denied illicit drug use, excessive drinking, frequenting bars, trouble with the law, suicidal ideation or thoughts of hurting others (Tr. 692-695). He reported that his depressive episodes were marked by crying and feelings of hopelessness (Tr. 693).

Plaintiff indicated that he seldom read and often forgot to pay bills (Tr. 694). He added that he regularly lost his keys and left his wallet at home when going out to shop (Tr. 694). Testifying that "all I've known is construction all my life," Plaintiff noted that after his first back surgery (in 1993) he attempted retraining by attending a local college but "couldn't comprehend" the material (Tr. 695-696). In response to questions by his attorney, Plaintiff again stated that he could not afford psychological counseling (Tr. 696). He

-4-

reporting using a back brace occasionally and a TENS unit at least every other day, adding that back pain obliged him to lie down 10 to 20 minutes every day (Tr. 697-698). Plaintiff denied taking special education classes in school but noted that he experienced difficulty in both biology and government (Tr. 699).

### B. Testimony of Plaintiff's Mother, Carol Brown

Ms. Brown testified that Plaintiff's back pain required him to perform household chores at a slow pace (Tr. 702). She reported that Plaintiff was unable to sit for extended periods, also noting that his back pain created sleep disturbances (Tr. 703). She indicated that Plaintiff exhibited concentrational problems and forgetfulness, noting that he would either neglect to pay bills or misaddress payment envelopes (Tr. 702-703). Acknowledging that Plaintiff drank to excess in the past, Ms. Brown denied that he had a current drinking problem or experienced trouble getting along with others (Tr. 703).

### C. Medical Expert Testimony

Dr. Robert Fritzen, a clinical psychologist, began his testimony by questioning Plaintiff (Tr. 706). Plaintiff admitted that he was able to follow the plot of a half-hour television show, denied psychiatric hospitalizations, and allowed for the possibility that he could perform a one or two-step job, depending on whether he was required to sit or stand in one position for extended periods (Tr. 707).

Dr. Fritzen found that Plaintiff experienced "a major depressive disorder and depression or pain secondary to a medical and psychological condition" (Tr. 708). He determined that Plaintiff's limitations in activities of daily living and social functioning were

"mild," but that he experienced "moderate" deficiencies in "concentration, persistence, or pace" (Tr. 709). Dr. Fritzen concluded that Plaintiff would experience difficulty performing "detailed work" but could follow "simple one or two step instructions" so long as his physical problems were accommodated (Tr. 710-711). Dr. Fritzen qualified his findings by stating that "[i]f the pain were significant . . . it would increase the depression and create some difficulties associated with his maintaining consistency at a work level . . ." (Tr. 711). He opined that "[t]he only obvious problem is I believe psychotherapeutic intervention would be of great assistance and I would hope that would be developed as soon as possible" (Tr. 711). In response to questioning by Plaintiff's attorney, Dr. Fritzen observed that while Plaintiff's achievement testing was "borderline" in reading and mathematics, he exhibited normal intelligence when testifying (Tr. 712).

### D.    Medical Evidence

### 1. Treating Sources

July, 1993 physical therapy notes indicate that Plaintiff underwent a laminectomy after rupturing a spinal disc while lifting a manhole cover (Tr. 173, 333). November, 1993 treating notes indicate that Plaintiff increased his back strength over the course of physical therapy (Tr. 171). The following month, Plaintiff, intent on entering a retraining program, opined that despite his improvement, he would be unable to return to his former work (Tr. 169).

Also in December, 1993, occupational therapy notes state that Plaintiff "demonstrated the ability to sustain[] work activity without an unscheduled break for up to 120 minutes on

-6-

a dependable basis" (Tr. 203).  Plaintiff continued to report back stiffness (Tr. 203).  In July, 1994, treatment notes indicate that he re-injured his back after moving an air-conditioning unit (Tr. 204).  Plaintiff received a work clearance in October, 1994 (Tr. 181).

In August, 2001, medical treating notes indicate that Plaintiff sought emergency treatment after hurting his back at work (Tr. 229).  In September, 2001, neurologist Mark S. Adams, M.D. advised conservative treatment (Tr. 263).  Later the same month, Dr. Adams opined that it was "unlikely" that Plaintiff could return to "heavy lifting, stooping, [or] bending" (Tr. 262).

In January, 2002, Dr. Adams advised Plaintiff to continue conservative treatment (Tr. 259).  In February, 2002, a Functional Capacity Evaluation Summary, noting that Plaintiff had recently ruptured three discs, concluded that he could perform a range of exertionally medium work (Tr. 210).  In July, 2002, Dr. Adams, noting that Plaintiff was still experiencing "pain and problems," opined that he should stay off work for at least another four months (Tr. 258).  In December, 2002, Plaintiff reported injuring his left knee on vacation while using his quadrunner (Tr. 243).   Robert Grimshaw, D.O. found that Plaintiff experienced a "likely" tear of the medial collateral ligament (Tr. 243).   A February, 2003 MRI of the lumbar spine showed "broad annular bulging" at L5-S1 "at most producing mild effacement of the left exiting nerve root" (Tr. 250).  In April, 2003, Plaintiff sought emergency treatment for continuing back pain (Tr. 255).  In May, 2003, Dr. Robert Grimshaw observed that Plaintiff "frequently grab[bed] his lower back because of pain" (Tr. 241).  The same month, an MRI of the lumbar spine showed scar tissue "encasing the

intraspinal right L5 nerve root" (Tr. 248-249).  Upon reviewing the imaging studies, Dr. Adams advised undergoing "a lumbar decompression and pedicle screw fusion" at L4-5 (Tr. 252).  Physical therapy notes from the same month indicate that Plaintiff felt "somewhat better," expressing apprehension that he would need to undergo additional surgery (Tr. 272). Plaintiff canceled his May 22, 2003 appointment, reporting that he could not find a ride (Tr. 271).  In June, 2003 a CT scan of the the lumbar spine showed "T12-L1 intervertebral" disc spacing "within normal limits" (Tr. 340).  The same month, Herbert J. Roth, Jr., M.D. stated that he did "not see anything specifically that I would recommend surgery for," instead recommending epidural steroid injections (Tr. 265).

In September, 2003, Carol van der Harst, M.D. concluded that Plaintiff was disabled from all work, but recommended "non-surgical" care (Tr. 301, 321). She noted that Plaintiff's current drug combination of Celebrex, Skilaxin and Darvocet kept Plaintiff "quite sedated" (Tr. 320).   Dr. Roth found that Plaintiff experienced only limited results from a series of epidural injections (Tr. 445-446-451).  The same month, Dr. Grimshaw noted that Plaintiff exhibited good coordination, reflexes, and muscle tone (Tr. 436).  Plaintiff reported that he felt best when standing (Tr. 436).  Dr. van der Harst's November, 2003 treating notes state that Plaintiff was currently "raising dogs, and looking for financial options to returning to work" (Tr. 314).

In March, 2004, psychiatrist Barry R. Binkley, M.D. diagnosed Plaintiff with

depression, assigning him a GAF of 52[2] (Tr. 363).   Plaintiff was encouraged to apply for one

job each week (Tr. 354).   In June, 2004, Dr. van der Harst noted that Plaintiff "ha[d] not

found work within his [exertional] capacity" (Tr. 307).   In July, 2004, Dr. Binkley, noting

that Plaintiff experienced depression as a result of health problems and income loss, assigned

him a GAF of 50[3] (Tr. 365).   In October, 2004, Dr. van der Harst remarked that Plaintiff had

discontinued taking Clonazepam and Ultracet (Tr. 303). In November, 2004, Dr. van der

Harst, noting that while Plaintiff's "vocational interruption and financial stress" had caused

depression, he was capable of "light work on a full-time basis" (Tr. 368).   She found that due

to receiving psychiatric treatment, Plaintiff's "depression and anxiety ha[d] improved"(Tr.

368).   She noted however that Plaintiff's attempt to work as a bartender failed due to the need

to bend, twist, stand, and walk for extended periods (Tr. 368).   The same month, a

representative of the Fraternal Order of Eagles, noting that Plaintiff had attempted to

volunteer as a bartender one to two days a week, reported that Plaintiff quit after

experiencing back discomfort even when working on non-consecutive days (Tr. 371).

December, 2004 psychological therapy notes indicate that Plaintiff experienced moderate

---

[2]A GAF score of 51-60 indicates "moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school function."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders –Text Revision* at 34 (*DSM-IV-TR*), 30 (4th ed.2000).

[3]A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision*, 34 (*DSM-IV-TR* )  (4th ed.2000).

impairments in physical health and his marriage relationship, but otherwise mild limitations (Tr. 398). Plaintiff received a GAF of 54 (Tr. 388).

In February, 2005, Plaintiff reported to Dr. van der Harst that he was enrolled in college classes but experienced difficulty in both math and English (Tr. 438). The same month, an MRI of the lumbar spine showed unchanged results (Tr. 444). Dr. Adams renewed Plaintiff's option of undergoing a lumbar decompression (Tr. 461). In April and May, 2005, pain specialist Karl R. Freydl, D.O. noted Plaintiff's "longstanding problem with low back pain," recommending a discogram (Tr. 520). In May, 2005, Dr. Freydyl administered caudal epidural steroid injections with a "Racz" needle, noting that Plaintiff was unresponsive to prior conventional epidural injections (Tr. 513-514). The following month, Plaintiff reported "10 days of excellent relief" (Tr. 506). In July, 2005, Plaintiff reported "over one month of relief" from a second injection (Tr. 499).

In April, 2006, Dr. Adams, again noting "markedly worse appearing discs at L4/5 and L5/S1, recommended surgery (Tr. 481). In June, 2006, George Pestrue, Ph.D. performed a mental status examination, noting that Plaintiff reported having 15 to 20 good friends, caring for his daughter, watching television, looking for a place to live and doing back injury research on the internet; and going to the health club (Tr. 470). Plaintiff's exhibited good hygiene, but frequently shifted positions "in an attempt to relieve his discomfort" (Tr. 470). Plaintiff's reading, spelling, and math scores were "borderline defective" (Tr. 472). Dr. Pestrue opined that back problems, combined with depression and learning deficits, interfered with Plaintiff's ability to find work (Tr. 473). He assigned Plaintiff a GAF of 50

with marked impairments in carrying out detailed instructions, maintaining concentration, working without psychologically based interruptions, or traveling in unfamiliar places (Tr. 473-475).

In September, 2006, a psychiatric assessment indicated that while Plaintiff had recently gone through a divorce, he currently lived with his current girlfriend and daughter (Tr. 529). He reported reduced stress levels since his divorce was finalized, but complained that he was "unable to pursue previously enjoyed activities" (Tr. 529). Plaintiff, reporting that his girlfriend had driven for the two-hour trip to the consultive examination, noted that he had to "stop every half hour to stretch and move" (Tr. 530). Marla Hires, M.D. prescribed Cymbalta, assigning Plaintiff a GAF of 50-55 (Tr. 531). Dr. Hires noted that Plaintiff "ha[d] less anxiety regarding . . . ongoing pain" than toward "divorce and relationship problems" (Tr. 531). In October, 2006, Dr. Frydl expressed doubt that Plaintiff would achieve good results from surgery, noting that Plaintiff needed "to build up some core strength" (Tr. 532). Dr. Frydl opined that given Plaintiff's condition, he "would need to [lie] down at unpredictable times during the day" (Tr. 532).

In September, 2007, a CT scan of the cervical spine was unremarkable (Tr. 558). In November, 2007, Dr. Pestrue again found that Plaintiff experienced marked deficiencies in concentration, punctuality, and the ability to work without psychologically based interruptions (Tr. 570-571). However, Plaintiff exhibited good contact with reality but poor self-esteem (Tr. 566). Dr. Pestrue assigned Plaintiff a GAF of 48 (Tr. 569). The same month Dr. Freydl administered epidural injections (Tr. 560-561).

### 2. Consultive and Non-Examining Sources

In January, 2003, R. Scott Lazzara, M.D. examined Plaintiff on behalf of the SSA, noting that he walked "with a stiff legged gait[] primarily due to pain" (Tr. 232). Plaintiff reported that he could walk up to four miles and lift up to 30 pounds, but performed activities of daily living slowly (Tr. 230, 328). Plaintiff exhibited normal cognitive and concentrational abilities, but difficulty heel and toe walking, squatting, and hopping (Tr. 231-232, 329-330). A Physical Residual Functional Capacity Assessment performed the same month found that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; stand, sit, or walk up to six hours a day; and unlimited upper  and *limited* lower extremity pushing and pulling (Tr. 234). The Assessment limited Plaintiff to *occasional* stooping, kneeling, crouching, and crawling, but *frequent* climbing and balancing (Tr. 235). The Assessment found the absence of manipulative, visual, communicative, or environmental limitations (Tr. 236-237).

A May, 2005 Psychiatric Review Technique performed on behalf of the SSA, acknowledging the presence of an affective disorder (depression) (Tr. 417, 420), found that Plaintiff experienced *mild* restrictions in activities of daily living and social functioning, and *moderate* deficiencies in concentration, persistence, or pace (Tr. 427). The reviewing consultant, noting that Plaintiff was currently attending college, found that he could perform "unskilled tasks on a sustain[ed] basis" (Tr. 429). A Mental Residual Functional Capacity Assessment performed the same month found that Plaintiff's ability to understand, remember, and carry out detailed instructions; maintain concentration for extended periods;

perform activities within a schedule; complete a normal workweek without the interruption of psychologically based symptoms; and respond appropriately to workplace changes were *moderately* limited (Tr. 431-432).

The same month, a Physical Residual Functional Capacity Assessment found that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; stand, walk or sit for about six hours in an eight-hour day; and an unlimited ability to push and pull in the upper extremities (Tr. 453). The Assessment found that pushing and pulling of the lower extremities was limited (Tr. 453). Plaintiff was precluded from all crawling and climbing (ladders, ropes, and scaffolds) (Tr. 454). He was limited to *occasional* balancing, stooping, kneeling, crouching, and climbing (ramps and stairs) (Tr. 454). Manipulative limitations consisted of a preclusion on overhead reaching (Tr. 455). The absence of visual or communicative restrictions was noted (Tr. 455-456). Plaintiff was precluded from working with machinery or at heights (Tr. 456). The reviewing consultant found allegations of disability "partially credible," noting that Plaintiff was currently attending college (Tr. 454).

### 3. Material Submitted Subsequent to the Administrative Decision

On January 2, 2008, Dr. Freydl issued a medical source statement, opining that any surgical intervention would be "extensive," noting that Plaintiff "has not been interested in going through with this procedure and certainly would like to exhaust all available options prior to considering this" (Tr. 573). Dr. Freydl also found that Plaintiff's physical problems had been exacerbated by depression and anxiety (Tr. 573). He opined as follows:

"At this point [Plaintiff] would possibly need to lie down at unpredictable

-13-

times during the day.  He would need to sit, stand and walk as tolerated and should not do any repetitive bending, lifting or twisting"

(Tr. 573).

### E.      Vocational Expert Testimony

VE Stephanie Leech classified Plaintiff's past relevant work as a school janitor as extertionally medium and semiskilled; equipment operator and construction laborer, heavy/semiskilled; production laborer, heavy/unskilled; and welder, medium/semi-skilled[4] (Tr. 716).

The ALJ then posed the following hypothetical question:

"[P]lease assume a person with the claimant's age, education, work experience, and skill set who is able to lift up to 20 pounds occasionally.  Lift or carry up to 10 pounds frequently.  And light work is defined by the Regulations [as] allowing this person to sit or stand alternatively at will.  Never operating foot controls.  Never climbing ladders, ropes, or scaffolds.  Occasionally climbing ramps or stairs.  Occasionally balancing.  Occasionally stooping.  Occasionally crouching.  Never kneeling.  Never crawling.  Avoid concentrated use of moving machinery.  Avoiding concentrated exposure to all unprotected heights. And work which is limited to one or two step tasks and simple routine and repetitive nature.  With only occasional interaction with the public and only occasional interaction with co-workers.   Can an individual with these limitations perform claimant's past work as claimant performed it or as customarily performed?"

(Tr. 716).

---

[4]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

-14-

The VE found that given the above limitations, the individual would be unable to perform any of Plaintiff's former jobs (Tr. 716).  However, she found that the same individual could perform the light work of an assembler (2,500 positions in the regional economy), packer (3,100), and inspector (3,200) (Tr. 717).  The VE  found that  if the individual was limited to sedentary work, he could perform the work of a (sedentary) assembler (2,000), inspector (1,500), and sorter (1,000) (Tr. 718).  She found that if the individual was additionally limited by pain and concentrational problems preventing him from working on a continuous basis for 40 hours each week, all competitive work would be precluded (Tr. 718).  The VE stated that her testimony was consistent with the information found in the Dictionary of Occupational Titles ("DOT") (Tr. 719).

### F.    The ALJ's Decision[5]

Citing Plaintiff's medical records, ALJ Fina determined that Plaintiff experienced the severe impairments of a "major depressive disorder, depression secondary to medical condition, degenerative disc disease and degenerative joint disease," finding however, that the impairments did not meet or medically equal one of the listed impairments found in Appendix 1, Subpart P, Regulation No. 4 (Tr. 19).

The ALJ found that Plaintiff retained the following residual functional capacity ("RFC"):

---

[5]December 27, 2007 decision.

"to perform a restricted range of sedentary work as defined by the regulation allowing him to sit or stand alternatively at will. The claimant cannot perform work that requires the use of foot controls. The claimant can never climb ladders, ropes or scaffolds, or kneel or crawl. He can occasionally climb ramps or stairs, balance, stoop, or crouch. The claimant must avoid concentrated exposure to use of moving machinery and concentrated exposure to unprotected heights. The Claimant is also limited to work that consists of simple, routine, repetitive, one or two step tasks. The claimant can perform jobs that require only occasional interaction with the public or co-workers"

(Tr. 19). Adopting the VE's *sedentary* job findings, the ALJ found that although Plaintiff was unable to perform any of his former positions, he could work as a assembler, inspector, or sorter (Tr. 25). The ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects" of depression and his back condition "not entirely credible" (Tr. 22). He gave "little weight" to Dr. Frydl's October, 2006 opinion that Plaintiff experienced potentially disabling impairments, noting that it stood at odds with Dr. van der Harst's November, 2004 finding that Plaintiff was capable of exertionally light or sedentary work (Tr. 23).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and

-16-

"presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*,  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).


## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at

step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.  The Hypothetical Question

Plaintiff argues that the hypothetical posed to the VE did not reflect the actual severity of his mental and physical impairments.  *Plaintiff's Brief, Docket #11*, 3-8.  Citing *Varley v. Secretary of HHS,* 820 F .2d 777, 779 (6th Cir. 1997), he contends that the ALJ's failure to account for key impairments mandates a remand for further fact-finding.  *Id.*

*Varley* sets forth the Sixth Circuit's requirements for a hypothetical question. "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question, but only if the question accurately portrays [the] plaintiff's individual physical and mental impairments" (internal citations omitted). *Id*. at 779; *See also Webb v. Commissioner of Social Sec*. 368 F.3d 629, 632 (6th Cir. 2004).  The hypothetical question must be supported by record evidence.  However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of Health and Human Services,* 39 F.3d 115,118-119 (6th Cir.1994)(*citing Hardaway v. Secretary of Health & Human Servs.,* 823 F.2d 922, 927-28 (6th Cir.1987)).

### 1.  Concentrational Impairments

Plaintiff argues specifically that limiting him to "simple, routine, and repetitive work"

is insufficient to account for his moderate concentrational impairments.  *Plaintiff's Brief* at

4 (*citing* Tr. 716); *Benton v. Comissioner of Social Security,* 511 F. Supp. 2ⁿᵈ 842 (E.D.

Mich. 2007)(Roberts, J.).

      Contrary to this argument, the hypothetical limitations amply address Plaintiff's

moderate concentrational limitations.  Plaintiff relies on *Benton* for the proposition that the

hypothetical limitation of simple and routine work is insufficient to account for his moderate

concentrational limitations.  However here, unlike in *Benton,* the ALJ also specifically

limited Plaintiff to "one or two step tasks"[6] (Tr. 716).  *Benton,* at 846.  While Plaintiff also

argues that these additional restrictions are inadequate, the ALJ drew the "one or two step"

limitation directly from the Dr. Fritzen's hearing testimony that Plaintiff's moderate

concentrational deficiencies would not prevent work limited to "simple one or two step

instructions" (Tr. 710-711).

      The ALJ's choice of concentrational limitations is further supported by the Plaintiff's

treating records.  With the exception of Dr. Pestrue's extreme psychological findings, none

of his medical or psychological treating sources suggested that Plaintiff lacked the

---

[6]

Futher, in *Chartier ex rel. Chartier v. Astrue,* 2008 WL 795873, *4 (E.D.Mich.,2008)(Cohn, J.) the court held that despite the ALJ's finding that the plaintiff experienced "moderate" limitations in concentration, persistence, and pace, the hypothetical question, stating only that the plaintiff should be limited to "simple and repetitive tasks," was well-supported by the record.  *Id.*; 07-10912, *Docket #9*, transcript pgs. 26, 531.   Here as well, the ALJ was not required to use formulaic language to account for Plaintiff's moderate deficiencies, provided that the hypothetical question reflected his relevant limitations.  *See Smith  v. Halter,* 307 F.3d 377, 379 (6ᵗʰ Cir. 2001)

concentration to perform unskilled one and two step work.  A letter submitted by the Fraternal Order of Eagles, stating that Plaintiff was unable to continue his bartending position due to the bending and standing requirements, makes no mention of concentrational or behavioral problems (Tr. 371).  Dr. Binkley, encouraging Plaintiff to apply for one job each week, never suggested that Plaintiff was unable to perform work involving one or two step tasks (Tr. 354).

### 2.  Physical Impairments

Likewise, the ALJ's choice of physical limitations is well supported.  Plaintiff, citing Dr. Frydl's October, 2006 opinion, contends that his need to lie down at unpredictable times during the day would preclude even sedentary work. *Plaintiff's Brief* at 6-7 (*citing* Tr. 532).  Plaintiff also cites his own November, 2004 testimony that he needed to lie down as often as every other day to relieve back problems (Tr. 602-603).  However, substantial evidence found elsewhere amply supports the ALJ's conclusion that Plaintiff could perform sedentary work with a sit/stand option.  Plaintiff admitted that he drove his daughter to school on daily basis and sat as a passenger on longer car trips, alleging only that he needed to stand and move around every half hour (Tr. 530).  While his medical records support the conclusion that he required frequent position changes (accounted for in the hypothetical question limiting him to sit/stand work) his present contention that he would need to recline at unpredictable intervals is contradicted by other evidence.

-20-

**B.  A Sentence Six Remand**

On a related note, Plaintiff contends that the case should be remanded to the administrative level consistent with "Sentence Six" of 42 U.S.C. §405(g) for consideration of Dr. Freydl's January 2, 2008 medical source statement, issued subsequent to the December 27, 2007 administrative opinion.  *Plaintiff's Brief* at 8-9.

Pursuant to *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir. 1993), material submitted to the Appeals Council subsequent to the administrative decision is subject to a narrow review by the district court.  Where the Appeals Council denies a claimant's request for a review of his application based on new material, the district court cannot consider that new evidence in deciding whether to "uphold, modify, or reverse the ALJ's decision." *Id.,* 2 F.3d at 695-96. Sentence Six of 42 U.S.C. § 405(g) states that the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but *only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . .*" (emphasis added).   In order for a plaintiff to satisfy his burden of proof as to materiality, he must demonstrate that there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence. *Sizemore v. Secretary of Health & Human Services,* 865 F.2d 709, 711 (6th Cir. 1988).  Hence, this Court may consider the additional evidence only for purposes of determining whether remand is appropriate under the sixth sentence of 42 U.S.C. §405(g).

The Court does not dispute that Plaintiff has shown good cause for Dr. Freydl's January 2, 2008 statement, made only within three weeks of the administrative hearing. However, Plaintiff cannot establish that the statement is material to the outcome of the case. Plaintiff argues that Dr. Freydl's January, 2008 discussion of annular tears was "more detailed" than in his October, 2006 statement (Tr. 532, 572-573).   However, evidence submitted prior to the December 27, 2007 ruling acknowledges repeatedly that Plaintiff experienced substantial exertional and non-exertional limitations as a result of back pain. The ALJ clearly considered this material when crafting the hypothetical question and RFC. The later statement does not suggest a greater level of limitation than already stated by earlier records.  More significantly, while Dr. Freydl stated in October, 2006 that Plaintiff "would need" to lie down at unpredictable times, the January, 2008 assessment qualifies the earlier opinion, stating that Plaintiff "would *possibly* need to lie down at unpredictable times during the day" (Tr. 573)(emphasis added).  Finally, I note that Dr. Freydl's opinion that Plaintiff was incapable of repetitive bending, lifting or twisting comports with the RFC's postural limitations (Tr. 19).  Because Plaintiff cannot show that the ALJ would reach a different decision if presented with the January 2, 2008 statement, his motion for a Sentence Six remand should be denied.

In closing, I note that the non-disability determination is not intended to trivialize Plaintiff's limitations as a result of his back condition and depression.   However, the fact that I might find differently upon *de novo* review is of no import.  Based on a review of this

record as a whole, the ALJ's decision is clearly within the "zone of choice" accorded to the fact-finder at the administrative hearing level pursuant to *Mullen v. Bowen*, *supra*, and should not be disturbed by this Court.

## IV.  CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment DENIED.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1 (d)(2).  Failure to file specific objections constitutes a waiver of any further right to appeal.  *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct.46, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local* 231, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1 (d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response should not be more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The

response shall address specifically, and in the same order raised, each issue contained

within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated:  August 25, 2009

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys
and/or parties of record by electronic means or U.S. Mail on August 25, 2009.

s/Susan Jefferson
Case Manager

-24-